**UNITED STATES of America, Appellee,**

v.

**A. Alvin GREBER, Appellant.**

**No. 84–1546.**

United States Court of Appeals, Third Circuit.

Argued Feb. 25, 1985.

Decided April 30, 1985.

As Amended May 15, 1985.

---

Thomas B. Rutter (argued), Rutter, Turner & Stein, Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst U.S. Atty., Chief of Appeals, Gregory P. Miller, Asst. U.S. Atty., Chief, Crim. Div., Glenn B. Bronson (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before WEIS, BECKER and WISDOM,[*] Circuit Judges.

### OPINION OF THE COURT

WEIS, Circuit Judge.

In this appeal, defendant argues that payments made to a physician for professional services in connection with tests performed by a laboratory cannot be the basis of medicare fraud. We do not agree and hold that if one purpose of the payment was to induce future referrals, the medicare statute has been violated. We also hold that the materiality of utterances charged to be within the false statement statute is an essential element of the crime to be decided by the trial judge as a matter of law. We find the district court's rulings consistent with our determinations and accordingly will affirm.

After a jury trial, defendant was convicted on 20 of 23 counts in an indictment charging violations of the mail fraud, Medicare fraud, and false statement statutes. Post-trial motions were denied, and defendant has appealed.

Defendant is an osteopathic physician who is board certified in cardiology. In

---

[*] The Honorable John Minor Wisdom, Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

addition to hospital staff and teaching positions, he was the president of Cardio-Med, Inc., an organization which he formed. The company provides physicians with diagnostic services, one of which uses a Holter-monitor. This device, worn for approximately 24 hours, records the patient's cardiac activity on a tape. A computer operated by a cardiac technician scans the tape, and the data is later correlated with an activity diary the patient maintains while wearing the monitor.

Cardio-Med billed Medicare for the monitor service and, when payment was received, forwarded a portion to the referring physician. The government charged that the referral fee was 40 percent of the Medicare payment, not to exceed $65 per patient.

Based on Cardio-Med's billing practices, counts 18–23 of the indictment charged defendant with having tendered remuneration or kickbacks to the referring physicians in violation of 42 U.S.C. § 1395nn(b)(2)(B) (1982).

Counts 12 through 17 alleged that defendant made false statements to Medicare in violation of 18 U.S.C. § 1001 (1982). Defendant submitted claim forms representing that the Holter-monitors had been operated for eight hours or more when in fact the devices had been used for a much shorter time. Medicare required at least eight hours of operation to qualify for payment.

Counts 5 to 11 charged mail fraud. According to the indictment, defendant caused Cardio-Med to bill Medicare for monitorings which were medically unnecessary.

Mail fraud was also charged in counts 1 to 4. Defendant allegedly used the mail to bill for hospital visits he never made.

The proof as to the Medicare fraud counts (18–23) was that defendant had paid a Dr. Avallone and other physicians "interpretation fees" for the doctors' initial consultation services, as well as for explaining the test results to the patients. There was evidence that physicians received "interpretation fees" even though defendant had actually evaluated the monitoring data. Moreover, the fixed percentage paid to the referring physician was more than Medicare allowed for such services.

The government also introduced testimony defendant had given in an earlier civil proceeding. In that case, he had testified that "... if the doctor didn't get his consulting fee, he wouldn't be using our service. So the doctor got a consulting fee." In addition, defendant told physicians at a hospital that the Board of Censors of the Philadelphia County Medical Society had said the referral fee was legitimate if the physician shared the responsibility for the report. Actually, the Society had stated that there should be separate bills because "for the monitor company to offer payment to the physicians ... is not considered to be the method of choice."

The evidence as to mail fraud was that defendant repeatedly ordered monitors for his own patients even though use of the device was not medically indicated. As a prerequisite for payment, Medicare requires that the service be medically indicated.

The Department of Health and Human Services had promulgated a rule providing that it would pay for Holter-monitoring only if it was in operation for eight hours or more. Defendant routinely certified that the temporal condition had been met, although in fact it had not.

On appeal, defendant raises several alleged trial errors. He presses more strongly, however, his contentions that the evidence was insufficient to support the guilty verdict on the Medicare fraud counts, and that the charge to the jury on that issue was not correct. As to the false statement counts, he argues that the materiality element should have been submitted to the jury rather than being decided as a matter of law by the court.

## I. MEDICARE FRAUD

The Medicare fraud statute was amended by P.L. 95–142, 91 Stat. 1183 (1977). Congress, concerned with the

growing problem of fraud and abuse in the system, wished to strengthen the penalties to enhance the deterrent effect of the statute. To achieve this purpose, the crime was upgraded from a misdemeanor to a felony.

Another aim of the amendments was to address the complaints of the United States Attorneys who were responsible for prosecuting fraud cases. They informed Congress that the language of the predecessor statute was "unclear and needed clarification." H.Rep. No. 393, PART II, 95 Cong., 1st Sess. 53, *reprinted in* 1977 U.S.CODE CONG. & AD.NEWS 3039, 3055.

A particular concern was the practice of giving "kickbacks" to encourage the referral of work. Testimony before the Congressional committee was that "physicians often determine which laboratories would do the test work for their medicaid patients by the amount of the kickbacks and rebates offered by the laboratory.... Kickbacks take a number of forms including cash, long-term credit arrangements, gifts, supplies and equipment, and the furnishing of business machines." *Id.* at 3048–3049.

To remedy the deficiencies in the statute and achieve more certainty, the present version of 42 U.S.C. § 1395nn(b)(2) was enacted. It provides:

"whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly in cash or in kind to induce such person—

\*   \*   \*   \*   \*   \*

(B) to purchase, lease, order, or arrange for or recommend purchasing ... or ordering any ... service or item for which payment may be made ... under this title, shall be guilty of a felony."

The district judge instructed the jury that the government was required to prove that Cardio-Med paid to Dr. Avallone some part of the amount received from Medicare; that defendant caused Cardio-Med to make the payment; and did so knowingly and willfully as well as with the intent to induce Dr. Avallone to use Cardio-Med's services for patients covered by Medicare. The judge further charged that even if the physician interpreting the test did so as a consultant to Cardio-Med, that fact was immaterial if a purpose of the fee was to induce the ordering of services from Cardio-Med.

Defendant contends that the charge was erroneous. He insists that absent a showing that the only purpose behind the fee was to improperly induce future services, compensating a physician for services actually rendered could not be a violation of the statute.

The government argues that Congress intended to combat financial incentives to physicians for ordering particular services patients did not require.

The language and purpose of the statute support the government's view. Even if the physician performs some service for the money received, the potential for unnecessary drain on the Medicare system remains. The statute is aimed at the inducement factor.

The text refers to "any remuneration." That includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended. "Remunerates" is defined as "to pay an equivalent for service." Webster Third New International Dictionary (1966). By including such items as kickbacks and bribes, the statute expands "remuneration" to cover situations where no service is performed. That a particular payment was a remuneration (which implies that a service was rendered) rather than a kickback, does not foreclose the possibility that a violation nevertheless could exist.

In *United States v. Hancock,* 604 F.2d 999 (7th Cir.1979), the court applied the term "kickback" found in the predecessor statute to payments made to chiropractors by laboratories which performed blood tests. The chiropractors contended that the amounts they received were legitimate handling fees for their services in obtaining, packaging, and delivering the specimens to the laboratories and then interpret-

ing the results. The court rejected that contention and noted, "The potential for increased costs to the Medicare-Medicaid system and misapplication of federal funds is plain, where payments for the exercise of such judgments are added to the legitimate cost of the transaction ... [T]hese are among the evils Congress sought to prevent by enacting the kickback statutes...." *Id.* at 1001.

*Hancock* strongly supports the government's position here, because the statute in that case did not contain the word "remuneration." The court nevertheless held that "kickback" sufficiently described the defendants' criminal activity. By adding "remuneration" to the statute in the 1977 amendment, Congress sought to make it clear that even if the transaction was not considered to be a "kickback" for which no service had been rendered, payment nevertheless violated the Act.

We are aware that in *United States v. Porter*, 591 F.2d 1048 (5th Cir.1979), the Court of Appeals for the Fifth Circuit took a more narrow view of "kickback" than did the court in *Hancock. Porter*'s interpretation of the predecessor statute which did not include "remuneration" is neither binding nor persuasive. We agree with the Court of Appeals for the Sixth Circuit, which adopted the interpretation of "kickback" used in *Hancock* and rejected that of the *Porter* case. *United States v. Tapert*, 625 F.2d 111 (6th Cir.1980).[1] *See also United States v. Duz-Mor Diagnostic Laboratory, Inc.*, 650 F.2d 223, 227 (9th Cir. 1981).

We conclude that the more expansive reading is consistent with the impetus for the 1977 amendments and therefore hold that the district court correctly instructed the jury. If the payments were intended to induce the physician to use Cardio-Med's services, the statute was violated, even if the payments were also intended to compensate for professional services.

A review of the record also convinces us that there was sufficient evidence to sustain the jury's verdict.

## II. FALSE STATEMENTS

■ Defendant also argues vigorously that he is entitled to a new trial on the false statement counts because the issue of materiality was not submitted to the jury. The government produced evidence showing that on certain occasions the Holter-monitor was used for less than eight hours, but defendant certified that it had been operated for at least that length of time. As noted earlier, that certification was a prerequisite for payment by Medicare and thus the issue of materiality must be addressed.

18 U.S.C. § 1001 provides that a person who "in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies ... a material fact, or makes any false, fictitious statements or representations" shall be guilty of a crime.

Defendant's contention is divided into two parts, first, that materiality is an essential element; second, that the issue is to be decided by the jury. We consider the two points in that order.

Most of the Courts of Appeals, with the exception of the Second Circuit, have held that materiality is an essential element. *See, e.g., United States v. Irwin*, 654 F.2d 671 (10th Cir.1981); *United States v. Valdez*, 594 F.2d 725 (9th Cir.1979); *but see United States v. Elkin*, 731 F.2d 1005 (2d Cir.1984).

In *United States v. Clearfield*, 358 F.Supp. 564 (E.D.Pa.1973), Judge Becker, now of this court, included materiality as one element of the offense. In the context of 18 U.S.C. § 1014, which prohibits false statements in loan applications, we had stated that materiality requires that the statements must have the capacity to influ-

---

**1.** Although the *Hancock* case is based on the Medicaid fraud provision found in 42 U.S.C. § 1396h(b)(1), the Medicare fraud section pertinent in this case shares common language and purposes. *See Tapert*, 625 F.2d at 113 n. 1, 2. Indeed, the title of the 1977 amendments was "Medicare-Medicaid Antifraud and Abuse Amendments."

ence; actual use of the representations in the decision-making is not necessary. *United States v. Goberman,* 458 F.2d 226 (3d Cir.1972). Adopting that rationale, Judge Becker phrased "[t]he test for materiality [under § 1001 as] whether the statement has a natural tendency to influence or be capable of influencing the agency, not whether it, in fact, did so influence it." 358 F.Supp. 574 n. 23.

In *United States v. Slawik,* 548 F.2d 75, 79 (3d Cir.1977), we held that materiality is an essential element of the perjury statute. 18 U.S.C. § 1625. We see no reason why the same burden should not be imposed on the prosecution in a false statement case as well. *See United States v. Protch,* 481 F.2d 647 (3d Cir.1973). *Cf. United States v. Silver,* 235 F.2d 375, 377 (2d Cir.1956) (materiality not an element of false statements but is for concealment offense). We hold, therefore, that materiality is an essential element of a § 1001 offense and join the majority of courts which have so held.

The record here contains enough evidence to support the district judge's ruling that the certifications to Medicare were material. It is not questioned that the statements that the monitors were being used for more than eight hours led to payment by the agency. If the elapsed time had been accurately reported, Medicare would not have allowed the claims. The element of materiality, therefore, is satisfied. The question remains, however, whether judge or jury was to make the determination. Our court has not yet specifically taken a position on the question, but in *United States v. Slawik* we held that in a perjury prosecution materiality is "a question of law, decision upon which is reserved to the court." 548 F.2d at 79.

Building upon the Supreme Court's holding in *Sinclair v. United States,* 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929), the majority of the Courts of Appeals have adopted the same position in false state-

ment cases under § 1001. In *Sinclair,* the Court reviewed a judgment against a defendant for refusing to answer the questions of a Congressional committee. The Court ruled that "pertinency" under the applicable statute "was rightly decided ... as one of law.... That question ... is not essentially different from the question as to materiality of false testimony charged as perjury in prosecution for that crime.... [T]he materiality of what is falsely sworn, when an element in the crime of perjury is one for the court." *Id.* at 298, 49 S.Ct. at 273.

Cases applying the same rule to § 1001 prosecutions have been decided by the courts in the Second, Fourth, Fifth, Seventh, Eighth, and D.C. Circuits.[2] We join that majority and accordingly reject the defendant's contention that the issue of materiality should have been submitted to the jury.

■ Defendant also contends that the district court erred in failing to conduct hearings into an off-the-record comment allegedly made by a witness to the jury. We are persuaded that the trial judge promptly and properly acted on the matter and no further hearing was necessary. We also find no merit in the defendant's complaint that an F.B.I. agent interviewed a potential expert witness for the defense before trial. The witness was not called, and defendant has demonstrated neither impropriety nor injury, nor necessity for a hearing.

Having carefully reviewed all of the defendant's allegations, we find no reversible error. Accordingly, the judgment of the district court will be affirmed.

---

**2.** *United States v. Bernard,* 384 F.2d 915 (2d Cir.1967); *United States v. Ivey,* 322 F.2d 523 (4th Cir.1963); *United States v. Hausman,* 711 F.2d 615 (5th Cir.1983); *United States v. Clancy,* 276 F.2d 617 (7th Cir.1960); *United States v.* *Hicks,* 619 F.2d 752 (8th Cir.1980); *Weinstock v. United States,* 231 F.2d 699 (D.C.Cir.1956). *Contra United States v. Irwin,* 654 F.2d 671, 677 n. 8 (10th Cir.1981); *United States v. Valdez,* 594 F.2d 725, 729 (9th Cir.1979).