**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee*,

v.

SIMON HONG, AKA Seong Hong,
AKA Seong W. Hong, AKA Seong
Wook Hong,
              *Defendant-Appellant.*

No. 17-50011

D.C. No.
2:16-cr-00038-
DOC-1

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted April 12, 2019
Pasadena, California

Filed September 12, 2019

Before: Richard A. Paez and Richard R. Clifton, Circuit
Judges, and Morrison C. England, Jr.,* District Judge.

Opinion by Judge Paez

---

*The Honorable Morrison C. England, Jr., United States District
Judge for the Eastern District of California, sitting by designation.

# SUMMARY[**]

---

## Criminal Law

The panel reversed convictions for aggravated identity theft (18 U.S.C. § 1028A(a)(1)), affirmed convictions for health care fraud (18 U.S.C. § 1347) and illegal remunerations for health care referrals (42 U.S.C. § 1320a-7b(1)(A)), and remanded for resentencing, in a case in which the defendant, who owned and operated acupuncture and massage clinics, engaged in a fraudulent Medicare-billing scheme with physical therapy companies.

Reviewing for plain error, the panel wrote that because the evidence of actual knowledge was overwhelming, it did not need to determine whether the district court erred by giving a deliberate-ignorance instruction on the knowledge element of health care fraud.

The panel held that even reviewing de novo, none of the defendant's arguments regarding the sufficiency of the evidence to support the illegal-remunerations convictions warrants reversal. The panel held that there was sufficient evidence for the jury to conclude (1) that patient referrals were one purpose for the kickbacks, (2) that the defendant referred the patients' Medicare information to the physical therapy companies, and (3) that the defendant received kickbacks for arranging the furnishing of services with the physical therapy companies. The panel held that any error

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

in omitting the "furnishing of services" language in the jury instruction was harmless.

The panel reversed the aggravated identity theft convictions because the defendant did not "use" the patients' identities within the meaning of § 1028A, where neither the defendant nor the physical therapists attempted to pass themselves off as the patients. The panel held that *United States v. Osuna-Alvarez*, 788 F.3d 1183 (9th Cir. 2015), forecloses the defendant's argument that the "without lawful authority" element of aggravated identity theft was not satisfied because the patients voluntarily provided their information.

The panel held that the district court did not err in applying Sentencing Guidelines enhancements for the defendant's obstruction of justice and aggravating role in the offense.

---

## COUNSEL

Carlton F. Gunn (argued), Kaye McLane Bednarski & Litt, Pasadena, California, for Defendant-Appellant.

Kerry Creque O'Neill (argued) and Byron McLain, Assistant United States Attorneys; Lawrence S. Middleton, Chief, Criminal Division; Nicola T. Hanna, United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

---

**OPINION**

PAEZ, Circuit Judge:

Simon Hong owned and operated acupuncture and massage clinics. He provided the Medicare-eligibility information and identities of his clinics' patients to physical therapy companies. Those companies would then submit claims to Medicare seeking payments for physical therapy treatments that had not been provided. The physical therapy companies paid a majority of the funds they received to Hong, who the government successfully prosecuted for health care fraud and related offenses.

Hong appeals his jury convictions for health care fraud in violation of 18 U.S.C. § 1347, illegal remunerations for health care referrals in violation of 42 U.S.C. § 1320a-7b(b)(1)(A), and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). He also challenges the district court's calculation of the United States Sentencing Guidelines ("U.S.S.G.") advisory range (i.e., the "advisory sentencing guidelines range"). We have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. We reverse the convictions for aggravated identity theft and remand for resentencing. On all other grounds we affirm.

**I.**

At trial, the government presented witnesses who had participated in the Medicare billing scheme and been separately charged as "co-schemers" (Joseff Sales, Eddieson Legaspi, and Danniel Goyena). The government also called as witnesses four patients who had received treatment at Hong's clinics; two federal investigators; a Medicare claims-processing expert; and a man who had coordinated a similar scheme with Hong's help (Byong Min). The government,

with these witnesses and documentary evidence, established the following facts.

Hong owned and operated three massage and acupuncture clinics in Southern California under the company names CMH Practice Solution, Hong's Medical Management, and HK Practice and Solution, Inc. Hong made arrangements with outpatient physical therapy companies, RSG Rehab Team, Inc. ("RSG") and Rehab Dynamics, Inc. ("RDI"), wherein he would provide the infrastructure of a clinic and they would bill Medicare. Unlike Hong and his clinics, as physical therapy companies, RSG and RDI had Medicare provider numbers that allowed them to submit claims for payments.

Hong provided the clinic space, a receptionist, massage therapists, acupuncturists, drivers, and patients who were on Medicare. The patients received massage and acupuncture treatments, but essentially no physical therapy. The patients did not pay for any treatments. They provided their Medicare identification information to the clinics and believed that Medicare would pay for the massages. Medicare does not pay for massages or acupuncture.[1]

RSG and RDI physical therapists used the patients' Medicare information to submit claims to Medicare for physical therapy services. Hong instructed the therapists to bill Medicare for four and later five units per patient per date of visit (where a unit is 15 minutes of service) in order to

---

[1] The Medicare expert testified that Medicare might pay for some massages, such as to loosen an extremely stiff joint, if performed by a physical therapist. In this case, the record is clear that the massages were not performed by physical therapists.

make more money.  RSG and RDI paid Hong's companies 56% of the payments they received from Medicare.

Hong's relationship with RSG began when he asked RSG to "back-bill[]" Medicare for physical therapy treatments that had not been provided in the past.  Sales, a physical therapist for RSG, testified that when he went to Hong's clinics he "almost never" provided physical therapy treatments.  Legaspi, a physical therapist for RDI, testified that he only met with about half of the patients for whom he prepared claims.  Legaspi observed that "about [one] hundred percent" of the patients received acupuncture or massages from Hong's employees "as opposed to any form of physical therapy."  When therapists asked Hong about providing patients with more physical therapy, Hong told them the patients prefer massages and might stop coming to the clinics if made to exercise.

Patients similarly testified that they received little to no physical therapy services.  They received "maybe 5 to 10 minutes" of physical therapy compared to approximately "40 to 50 minutes" of massage treatment each time they went to the clinic.  The patients who testified learned of the clinics through family or people in their neighborhoods, not through their doctors.  They went to Hong's clinics because of pain, and they wanted the massage or acupuncture treatments.

Through this scheme, thousands of false claims were submitted to Medicare for physical therapy services between May 2009 and November 2013.  Medicare paid a little over $2.9 million, of which Hong received just over $1.6 million. Hong received checks for his share of the Medicare payments at least once a week.

Hong also taught Min how to operate massage clinics and bill Medicare for physical therapy.  When Min learned

he was being investigated for fraud, he reached out to Hong, and Hong coached him to lie to investigators. Min testified that Hong told him to say that after the patients received physical therapy treatment, he would just provide acupuncture or massage treatment as an "extra service." Min also arranged for Hong to reassure the president of Min's physical therapy clinic, Julian Yniguez, that nothing would come of the investigation. Cooperating with investigators, Yniguez recorded his conversation with Hong. Min ultimately pled guilty to health care fraud and illegal remunerations in a separate case.

Later, federal investigators also recorded an interview with Hong, during which Hong said he knew acupuncture and massages could not be billed to Medicare. Hong agreed with the investigators that he was at his clinics "every day."

After the government rested, Hong moved for acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29, arguing insufficient evidence. The district court denied the motion. Hong did not present any witnesses.

The jury returned a guilty verdict on all counts: eight counts of health care fraud (Counts 1–8) (18 U.S.C. § 1347), nine counts of illegal remunerations (i.e., kickbacks) (Counts 9–17) (42 U.S.C. § 1320a-7b(b)(1)(A)), and two counts of aggravated identity theft (Counts 18–19) (18 U.S.C. § 1028A(a)(1)).

At sentencing, the district court calculated an offense level of 30 and a criminal history category I, which meant the advisory sentencing guidelines range was 97–121 months, in addition to a mandatory consecutive 24-month sentence for the aggravated identity theft convictions. *See* 18 U.S.C. § 1028A(a)(1). Relevant here, in reaching that range the district court applied a four-level role enhancement

under U.S.S.G. § 3B1.1(a) because Hong was an "organizer or leader" in criminal activity involving five or more participants. In addition to Hong, the district court found that Sales, Legaspi, Min, and Goyena were also participants in the scheme and recognized that there may have been others. The district court also acknowledged that another person named as a co-schemer in the indictment, Marlon Songco, had pled guilty. The district court also applied a two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1 based on Hong instructing and encouraging other co-schemers to lie to investigating agents. Hong objected to the obstruction of justice and role enhancements.

The district court sentenced Hong to 97 months imprisonment for the health care fraud convictions and 60 months imprisonment for the kickback convictions to run concurrently. For each aggravated identity theft conviction, the court sentenced Hong to 24 months imprisonment, to run concurrently with each other but consecutive to the other 97 months. This resulted in a total sentence of 121 months imprisonment.

## II.

On appeal, Hong raises separate challenges to each of his convictions. First, with respect to his convictions for health care fraud, Hong argues the district court erred in giving a deliberate ignorance instruction on the knowledge element. Second, Hong challenges his kickback convictions by arguing that referrals for health care services that were never actually provided are outside the scope of the statute criminalizing remunerations for health care referrals, and that the jury should have been so instructed. Third, Hong argues that submitting fraudulent Medicare claims with his clinics' massage patients' identifying information does not constitute aggravated identity theft.

Hong also challenges the district court's application of the obstruction of justice and role enhancements in calculating the advisory sentencing guidelines range.

## A. Health Care Fraud

We begin with Hong's challenges to his convictions for health care fraud. Defrauding a health care benefit program such as Medicare is unlawful. Pursuant to 18 U.S.C. § 1347:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud any health care benefit program; or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

For the "knowingly and willingly" part of the health care fraud elements, the jury was instructed on actual knowledge

and deliberate ignorance, the latter of which Hong challenges was in error.[2]

Because Hong did not object to this instruction in district court, we review for plain error. *United States v. Backman*, 817 F.3d 662, 665 (9th Cir. 2016). We may only correct a plain error where the appellant demonstrates that: (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *United States v. Marcus*, 560 U.S. 258, 262 (2010).

A deliberate ignorance—or "willful blindness"—instruction is only relevant if the jury rejects the government's evidence of actual knowledge. *United States*

---

[2] The deliberate ignorance instruction that was given at trial was the Ninth Circuit model jury instruction at the time, and is very similar to the current model instruction. The jury was instructed:

> You may find that the defendant acted knowingly if you find beyond a reasonable doubt that the defendant, first, was aware of a high probability that health care fraud was occurring and, second, deliberately avoided learning the truth.

> You may not find such knowledge, however, if you find that the defendant actually believed that there was no health care fraud, or if you find that the defendant was simply careless.

Model Crim. Jury Instr. 9th Cir. 5.8 (2014). The only difference in the current model instruction is that it ends, ". . . or if you find the defendant was simply negligent, careless, or foolish." *See* Model Crim. Jury Instr. 9th Cir. 5.8 (2018).

*v. Heredia*, 483 F.3d 913, 922 (9th Cir. 2007) (en banc). "In deciding whether to give a willful blindness instruction, in addition to an actual knowledge instruction, the district court must determine whether the jury could rationally find willful blindness even though it has rejected the government's evidence of actual knowledge." *Id*. A jury can believe some, but not all, evidence presented by a party. *Id*. at 923. As we have said before, "[t]he government has no way of knowing which version of the facts the jury will believe, and it is entitled (like any other litigant) to have the jury instructed in conformity with [different] rational possibilities. That these possibilities are mutually exclusive is of no consequence." *Id*. Still, "the district judge has discretion to refuse" the instruction even where its factual predicates are present. *Id*. at 924.

We need not determine whether it constituted error to give the instruction in this case because the evidence of actual knowledge was overwhelming and thus Hong's substantial rights were not affected. *Marcus*, 560 U.S. at 262. The jury heard a recording of Hong admitting to a federal investigator that he knew it was illegal to bill Medicare for massages and acupuncture. An employee of RSG testified that Hong had asked RSG to "back-bill[]" Medicare for physical therapy treatments that had not been provided in the past, where there was no way the physical therapy could ever have occurred. And another witness testified that Hong taught him how to use physical therapists for billing Medicare and to change locations every few years to avoid suspicion from Medicare. Given the strength of the testimony supporting a finding of actual knowledge, there was no plain error in also instructing the jury on deliberate ignorance.

**B. Illegal Remunerations for Health Care Referrals**

Next, we turn to Hong's convictions for illegal remunerations for health care referrals, i.e. "kickbacks," pursuant to 42 U.S.C. § 1320a-7b(b)(1)(A). This anti-kickback law prohibits "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) . . . for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program," such as Medicare. 42 U.S.C. § 1320a-7b(b)(1)(A).

In challenging these convictions, Hong advances related sufficiency of the evidence and jury instruction arguments. He does not contest that he received 56% of the Medicare payments. Instead, Hong argues there was insufficient evidence to support the kickback convictions for three reasons: the remunerations were not for the referral of patients, but for Hong's expenses to maintain the clinics; the patients learned of the clinics on their own; and the fraudulent billing was for services that were never furnished. The government argues that Hong waived the second and third contentions because when he moved for acquittal in the district court, Hong advanced only the first argument. *See United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("[W]hen a Rule 29 motion is made on a specific ground, other grounds not raised are waived." (citation omitted)).

Typically, we review de novo the sufficiency of the evidence. *Backman*, 817 F.3d at 665. When reviewing the sufficiency of the evidence to support a criminal conviction, we "determine whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*,

598 F.3d 1158, 1163–64 (9th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A waived ground, however, may be reviewed only to prevent a manifest miscarriage of justice. *Graf*, 610 F.3d at 1166. Even reviewing de novo each ground for insufficient evidence to support the kickback convictions, none supports reversal.

Hong's first argument is unavailing. Hong argues that because he spent the remunerations on the clinics' overhead expenses, the remunerations were not kickbacks for providing the patient information to the physical therapy companies.[3] This argument is at odds with *United States v. Kats*, where we recognized that the anti-kickback statute requires only that "one purpose of the payment" be to induce future referrals, "even if the payments were also intended to compensate for professional services." 871 F.2d 105, 108 (9th Cir. 1989) (quoting *United States v. Greber*, 760 F.2d 68, 69, 72 (3d Cir. 1985)).

Witnesses from the physical therapy companies testified that Hong provided them with the patients and their identifying Medicare information. Without the patients or their identifying Medicare information, the physical therapy companies could not have submitted claims to Medicare and, as Sales testified, they "wouldn't have . . . any part in the

---

[3] Hong argues the jury could not have found the payments were "primarily" for his referral of the patients to the physical therapists, drawing the word "primarily" from the jury instruction. *See infra* n.6. A conviction for kickbacks does not require the payments be "primarily" for referring patients, and the jury did not need to be so instructed. *See United States v. Kats*, 871 F.2d 105, 108 n.1 (9th Cir. 1989). "[A] sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016).

clinic." We therefore find there was sufficient evidence for the jury to conclude that referrals were one purpose for the kickbacks.

Hong's second argument fares no better. He argues that there was also insufficient evidence that he "referred" the patients since they learned of the clinics on their own, through word of mouth. The issue, however, is not how the patients selected a massage clinic, but how they—or their identifying Medicare information—reached the physical therapy companies filing claims for benefits. *See United States v. Patel*, 778 F.3d 607, 609, 613–16 (7th Cir. 2015) (disagreeing with the doctor's argument that he could not be liable for kickbacks because the "patient[s] independently chose a specific provider" given that he participated in a kickback scheme to sign referrals to that provider); *see also United States v. Dailey*, 868 F.3d 322, 330–31 (5th Cir. 2017) (calling the doctor who signed necessary referral forms and then received money in turn for those signatures a "gatekeeper" and affirming his health care kickbacks conviction). The evidence presented at trial was sufficient for the jury to find that Hong referred the patients' Medicare information to the physical therapy companies.[4]

Third, Hong's argument that he could not have violated the statute because physical therapy services were never

---

[4] In his reply brief, Hong reframes this argument to suggest that he would have been a referrer if RSG and RDI had physically separate facilities, but that providing the patients' information to RSG and RDI at his own clinics did not violate the anti-kickback statute. This new tactic does not save the argument. Hong collected the patients' information at the massage clinics and referred it to the physical therapy companies for billing, in return for payments—it does not matter whether the physical therapy companies were within the same building.

"furnished" also fails.[5]    The anti-kickback statute criminalizes remuneration for referrals for "the furnishing *or arranging for the furnishing* of any item or service . . ." 42 U.S.C.    § 1320a-7b(b)(1)(A)    (emphasis    added). Accordingly, by the statute's terms the services need not have been provided.   We have recognized that the anti-kickback statute is meant to address "the potential for unnecessary drain on the Medicare system." *Kats*, 871 F.2d at 108 (quoting *Greber*, 760 F.2d at 71).  In the anti-kickback statute, "any remuneration" includes "sums for which no actual service was performed" in addition to those for which some professional time was expended.  *Greber*, 760 F.2d at 71.  Thus, there was also sufficient evidence for the jury to conclude that Hong received kickbacks for arranging the furnishing of services with the physical therapy companies.

Relatedly, Hong argues that the district court erred by failing to instruct the jury that the referral had to be for the "'furnishing of any item or service' covered by Medicare." The district court instructed the jury on the elements of the kickback charges without using the statute's "furnishing" language.[6]  Hong did not object to the instruction at trial, so

---

[5] Hong agrees that submitting Medicare claims for unperformed services is fraud, but he contests that receiving money for unperformed services is a kickback.

[6] The jury was instructed:

> In order for the defendant to be found guilty of [illegal remunerations for health care referrals], the government must prove each of the following elements beyond a reasonable doubt:
>
> One, the defendant knowingly and willfully received money;

we review this claim for plain error.  *Backman*, 817 F.3d at 665; *see also Marcus*, 560 U.S. at 262 (identifying the four showings an appellant must make to establish plain error). Any error in omitting the "furnishing of services" language in the instruction was harmless and did not affect Hong's substantial rights or the outcome of the proceedings because unlawful remunerations include "sums for which no actual service was performed."  *Greber*, 760 F.2d at 71; *see also United States v. Vernon*, 723 F.3d 1234, 1262–63 (11th Cir. 2013) (finding no plain error where a similar instruction was given).

In sum, there was sufficient evidence to support Hong's convictions for violating the anti-kickback statute and there was no plain error in the jury instructions for those convictions.

## C. Aggravated Identity Theft

Hong's third set of convictions was for aggravated identity theft pursuant to 18 U.S.C. § 1028A(a)(1).  This identity theft statute prohibits "knowingly transfer[ring], possess[ing], or us[ing], without lawful authority, a means of identification of another person" during and in relation to

---

Two, the money was paid primarily in order to induce the referral of a patient insured by Medicare;

Three, the patient's services were covered, in whole or in part, by Medicare; and

Four, Medicare is a federal health care program.

There is no Ninth Circuit model jury instruction for the elements of 42 U.S.C. § 1320a-7b(b)(1)(A).  The instruction given in this case is consistent with the model instruction in the Eighth Circuit.  *See* Model Crim. Jury Instr. 8th Cir. 6.42.1320 (2018).

another felony, including health care fraud. 18 U.S.C. § 1028A(a)(1), (c). A conviction for aggravated identity theft carries a mandatory two-year term of imprisonment in addition to the punishment provided for the related felony. *Id*. § 1028A(a)(1).

The government alleged that Hong used the names and Medicare-eligibility information of patients to submit, with the help of his co-schemers, claims for benefits without lawful authority. Hong argues there was insufficient evidence of aggravated identity theft for two reasons: the "without lawful authority" element was not satisfied because the patients voluntarily provided their information; and this fraudulent billing does not constitute a "use" of the patients' identities within the meaning of the aggravated identity theft statute. Although framed as sufficiency of the evidence arguments, these are statutory interpretation arguments that we review de novo. *United States v. Osuna-Alvarez*, 788 F.3d 1183, 1185 (9th Cir. 2015).

The first argument is foreclosed by *Osuna-Alvarez*, in which we held that permission to use another's identity in an unlawful scheme is not "lawful authority" under section 1028A. *Id*. at 1185–86 ("This [statute] clearly and unambiguously encompasses situations like the present, where an individual grants the defendant permission to possess his or her means of identification, but the defendant then proceeds to use the identification unlawfully."). The same is true in the health care fraud context. *See United States v. Mahmood*, 820 F.3d 177, 187, 189 (5th Cir. 2016) (citing *Osuna-Alvarez* throughout); *United States v. Abdelshafi*, 592 F.3d 602, 607, 609 (1st Cir. 2010).

The latter argument presents a new question for our court: whether the fraudulent billing demonstrated in this case constitutes a "use" of the patients' identities under

section 1028A.  Under other criminal statutes, we interpret "use" in limited, context-specific ways.  *See, e.g.*, *United States v. Bain*, 925 F.3d 1172, 1177 (9th Cir. 2019) (describing our precedent limiting the "use" of a weapon pursuant to the federal bankruptcy statute, 18 U.S.C. § 2113(d), to "active employment of the weapon" (internal quotation omitted)).  Interpreting section 1028A, two of our sister circuits, the First and Sixth, have narrowly construed "use" and reversed convictions for aggravated identity theft in analogous contexts.  *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017); *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015).  We agree with their reasoning.

In *Medlock*, the defendants operated an ambulance service that transported patients to kidney dialysis facilities, and Medicare reimbursed them for the cost of such transports.  792 F.3d at 703.  The defendants filed Medicare claims falsely stating that stretchers were required for the transport, where the use of stretchers would entitle the ambulance service to Medicare reimbursement.  *Id*. at 705.  The Sixth Circuit looked to the text of section 1028A(a)(1), noting that because "Congress placed 'use' near 'transfers' and 'possesses,' . . . 'use' must have a more limited definition than the government suggests."  *Id*. at 706.  The Sixth Circuit reversed the aggravated identity theft conviction because although the defendants "*did* transport the specific beneficiaries whose names they entered on the forms[,] they lied only about their own eligibility for reimbursement for the service." [7]  *Id*.  Critically, the defendants "did not attempt to pass themselves off as anyone other than themselves.  [They] misrepresented *how and why*

---

[7] The Sixth Circuit recognized the defendants in *Medlock* acted "without lawful authority," but that did not alter the court's interpretation of "use."  *Id*. at 708.

the beneficiaries were transported, but they did not use those beneficiaries' identities to do so." *Id.* at 707; *see also United States v. Michael*, 882 F.3d 624, 629 (6th Cir. 2018) (interpreting *Medlock* and noting, hypothetically, that if a pharmacist "inflated the amount of drugs he dispensed, the means of identification of the [prescribing] doctor and patient would not have facilitated the fraud").

The First Circuit reached the same result in *Berroa*. There, the defendants obtained their medical licenses by fraud. 856 F.3d at 147–48. The government argued that filling prescriptions for patients—without lawfully obtained medical licenses—was "use" of the patients' identities for purposes of the aggravated identity theft statute. *Id.* at 155–56. But "the word 'use' is fraught with 'interpretational difficulties because of the different meanings attributable to it.'" *Id.* at 156 (quoting *Bailey v. United States*, 516 U.S. 137, 143 (1995), *superseded by statute on other grounds*, 18 U.S.C. § 924(c)(1)). As the First Circuit recognized, the legislative history of the aggravated identity theft statute "provide[s] several examples of identity theft. Notably, each of these examples involved the defendant's use of personal information to pass him or herself off as another person, or the transfer of such information to a third party for use in a similar manner." *Id.* (quoting H.R. Rep. No. 108-528, at 5–6, *reprinted in* 2004 U.S.C.C.A.N. 779, 781–82). These examples included "bogus Federal income tax returns in others' names" and "use of stolen identity to apply for and receive Social Security benefits." *Id.* (internal quotations omitted). "While, in a colloquial sense, [the defendants] could be said to have 'used' their patients' names in writing prescriptions, they certainly did not attempt to pass themselves off as the patients." *Id.* To interpret "use" broadly "could encompass every instance of specified criminal misconduct in which the defendant speaks or writes

a third party's name." *Id*. (citing *United States v. Spears*, 729 F.3d 753, 756 (7th Cir. 2013)). Given the legislative history and "limitless nature of the government's alternative construction," the First Circuit "read the term 'use' to require that the defendant attempt to pass him or herself off as another person or purport to take some other action on another person's behalf."[8] *Id*.

This case is analogous to *Medlock*. Hong provided massage services to patients to treat their pain, and then participated in a scheme where that treatment was misrepresented as a Medicare-eligible physical therapy service. *See Medlock*, 792 F.3d at 706. Neither Hong nor the physical therapists "attempt[ed] to pass themselves off as the patients." *Berroa*, 856 F.3d at 156. Hong's fraudulent scheme ran afoul of other statutes—namely, health care fraud and unlawful remunerations—but not section 1028A. We hold that Hong did not "use" the patients' identities within the meaning of the aggravated identity theft statute. Accordingly, we reverse Hong's convictions on Counts 18 and 19.

---

[8] In subsequent cases, our sister circuits have affirmed convictions for aggravated identity theft where defendants have "purport[ed] to take some other action on another person's behalf" through impersonation or forgery. *United States v. Valdes-Ayala*, 900 F.3d 20, 35 (1st Cir. 2018) (forging signatures); *United States v. Morel*, 885 F.3d 17, 23 (1st Cir. 2018) (depositing a forged check under another person's name and purporting to bear that person's signature); *see also United States v. Munksgard*, 913 F.3d 1327, 1330 (11th Cir. 2019) (internal quotations omitted) (forging another person's name to a contract submitted to a bank in support of a loan application).

## D. Advisory Sentencing Guidelines Range

Finally, Hong argues that the district court improperly applied enhancements for obstruction of justice and for his role in the offense in calculating his advisory sentencing guidelines range. "We review the district court's interpretation of the Sentencing Guidelines *de novo*, its application of the Guidelines to the facts of the case for an abuse of discretion, and its factual findings for clear error." *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014).

A district court may apply a two-level obstruction of justice enhancement to the base offense level "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . a closely related offense." U.S.S.G. § 3C1.1. The district court applied this enhancement based on Hong instructing and encouraging other co-schemers to lie to investigating agents. Specifically, the district court cited the audio recording of Hong speaking with a participant in Min's fraud scheme.

Hong objected to this enhancement in the district court, arguing that his statements were a denial of guilt, not obstruction. Now, Hong argues that Min's fraud was not part of Hong's "instant offense" or a "closely related offense," and his attempts to "reassure" Min and participants in his fraud scheme were not a "willful" attempt to obstruct an investigation. The government contends that because Hong's argument has shifted on appeal, we should review for plain error. But Hong's "basic claim remains the same"—that his communications with co-schemers were not obstruction—so we review for abuse of discretion the district court's application of the guidelines and for clear error its

factual findings.  *See Vallejos*, 742 F.3d at 905; *see also United States v. Wahid*, 614 F.3d 1009, 1016 (9th Cir. 2010) (declining to apply a heightened standard of review where defendant's arguments against the guidelines calculation were based on different enhancements in district court and on appeal).

"[U]nlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" is obstructive conduct.  U.S.S.G. § 3C1.1, cmt. 4(A).  While aware of an ongoing investigation, Hong told Yniguez, "just . . . make [a] story," and that he had "[a]lways" done that and "they didn't bring me to court."  There was no error in treating this as obstructive conduct because it could be a direct or indirect attempt to influence a potential witness (even though Yniguez did not end up being a witness).  We affirm the district court's application of the obstruction of justice enhancement in determining the advisory sentencing guidelines range.

A district court may apply a four-level aggravating role enhancement where, like here, "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ."  U.S.S.G. § 3B1.1(a).  A "participant" is "criminally responsible for the commission of the offense, but need not have been convicted." *Id*., cmt. 1.  The district court found a total of five or more participants by counting Sales, Legaspi, Songco, Min, and Goyena, in addition to Hong. [9]

---

[9] Because this enhancement, unlike the obstruction of justice enhancement, does not include "closely related offenses," the district court erred in counting Min as a participant.  Hong, however, concedes that there were five or more participants.  In addition to himself, he refers to three as "equally culpable" (Sales, Goyena, and Songco), as well as a

Hong objected to this enhancement in district court. On appeal, Hong argues there is no evidence of Hong acting as a leader or organizer.

The sentencing guidelines instruct the court to consider the following factors in determining whether a defendant had a leadership and organizational role:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others . . . This adjustment does not apply to a defendant who merely suggests committing the offense."

U.S.S.G. § 3B1.1, cmt. 4. Here, Hong recruited one of the physical therapy companies to the scheme by asking the physical therapists to bill Medicare for claims for physical therapy treatments that had never been performed. He provided the services for which the patients came to the clinic and disclosed their Medicare information. He instructed the physical therapists to bill for longer periods of time in order to claim a larger payment. *But see United States v. Holden*, 908 F.3d 395, 402–03 (9th Cir. 2018) (instructing a co-equal in a criminal scheme is "'facilitation' rather than 'organization'"). And Hong claimed the largest

---

fourth (Legaspi). Even without Min there were at least five participants, including Hong.

share—56%—of the payments from Medicare.[10]  Based on these findings, we affirm the application of the aggravating role enhancement in the sentencing guidelines range.

### III.

Hong participated in and, through kickbacks, profited from a health care fraud scheme.  His conduct, however, falls short of aggravated identity theft as it is contemplated in the statute.   We therefore reverse Hong's convictions for aggravated identity theft and remand for resentencing.  On all other grounds we affirm.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

[10] Hong provides no evidence for his argument that this arrangement was meant to or did equalize the amounts each participant received after paying their expenses.